Middleton, J.
Before serving in World War I and for about a year thereafter, Clay M. Thomas operated a route for a local laundry in Columbus. In 1920 he and his wife, to whom he was married in 1915, started a linen supply busines in a small cement-block building in the rear of their residence on Hunter avenue in Columbus. They furnished towels and linens to offices and other customers. Their initial capital was about $3,000. The busines grew. In 1922, they moved to larger quarters on Maple street. Early in 1924, Mr. Thomas purchased a lot on Grant avenue, built a two-story building on the rear of it and moved the business to that location. In 1926, he extended the building so that it covered the entire lot. In 1928 or 1929, he bought the lot next north and built a power plant on the rear third of that lot. About 1931, he built a four-story building on the remainder of that lot. In 1937 or 1938, he bought a lot across the street, with a 60-foot frontage, with the intention of erecting a building on it for servicing his trucks and for factory expansion. No building had been placed upon it at the time of Mr. Thomas ’ death.
Mr. Thomas gradually expanded his busines opera *512 tions. To the initial busines of furnishing laundered linen he added industrial laundry, general family laundry and the manufacture and sale of industrial garments. Fabrics were purchased in bulk and were cut and made up into towels, linen items and garments in the Grant avenue factory. For about two years Mr. Thomas operated the garment business through a corporation called Atlas Garment, Inc., but that corporation was dissolved before his death and the garment business was consolidated with the other lines.
Mr. Thomas’ business was known, and was referred to by him, as Atlas Linen Laundry & Supply. It is sometimes referred to herein as Atlas. Mr. Thomas was the sole proprietor of the entire business. He did not operate it through a corporation. Mrs. Thomas worked with him full time until about 1931.
In 1935 or 1936, Mr. Thomas, as an individual, began a real estate operation not connected with his linen supply business. He bought several outlying-lots in Columbus and built houses on them. Later he bought a large block of lots in Upper Arlington, a Columbus suburb, and was constructing houses on them at the time of his death. Title to all these lots was in the name of Clay M. Thomas.
In 1931, Harry B. Holmes became attorney for Mr. Thomas and continued as such. He became familiar with the entire business and was particularly active in connection with the real estate operations.
In 1936, Mr. Thomas developed some heart trouble and was not entirely well thereafter. This condition necessitated his partial absence from Columbus. He was not in Columbus from September 1, 1937, till Christmas, and he was in Coral Gables, Florida, all of the early part of 1938. He returned to Columbus in April of that year and died April 14, 1938.
The entire business of Mr. Thomas was built and operated out of earnings. He received no outside *513 capital. The extent of his success is indicated by the fact that the net profit for each of the years 1936 and 1937 exceeded $30,000.
On January 23, 1937, Mr. Thomas executed his will and on April 12, 1938, he executed a codicil thereto. Both instruments were drawn by Harry B. Holmes as his attorney. A complete copy of those instruments follows:
“Last Will and Testament
“I, Clay M. Thomas, of the city of Columbus, county of Franklin, and state of Ohio, being of full age and of sound mind and memory, do make, publish and declare this to be my last will and testament, hereby revoking all wills by me heretofore made.
“Item I.
“I direct that all my just debts and funeral expenses be paid out of my estate as soon as practicable after the time of my decease.
“Item II.
“I give and bequeath to my sister, Clara J. Thomas Mann, the sum of $15,000.00, the same to be paid to her by my said executor and trustee at the rate of $100.00 per month; but in the event that my "said executor or trustee should deem it necessary and convenient to pay to her more than $100.00 per month, he shall so do.
“Item III
“I give and bequeath to my sister, Millie K. Thomas Watson, the sum of $15,000.00, the same to be paid to her by my said executor and trustee at the rate of $100.00 per month; but in the event that my said executor or trustee shall deem it necessary and convenient to pay to her more than $100.00 per month, he shall so do.
“Item IV
“I give and bequeath to my brother, Ray G. Thomas, the sum of $15,000.00, the same to be paid to him by *514 my said executor and trustee at the rate of $100.00 per month; but in the event that my said executor or trustee should deem it necessary and convenient to pay to him more than $100.00 per month, he shall so do.
“It is my wish that my said trustee, Harry B. Holmes, or his successor in the trust, shall hold, manage and control the bequests hereinbefore made in items 2, 3 and 4, and that my said executor and trustee shall invest the said funds in government bonds or other securities of like nature as my trustee in his discretion may deem best, with the full power to pay to my sisters and brother the sum of $100.00 per month, to be applied on the amount of the bequests, and to pay such a sum over and above the $100.00 herein stipulated as in the discretion of my trustee may be necessary to provide a comfortable living for my said legatees hereinbefore referred to.
“In the event of the death of any of the legatees hereinbefore referred to, then his or her share shall be equally divided among my surviving .sisters or brothers, or any of them, share and share alike.
“And in the event of the death of all of my sisters and brothers before my death, then it is my will that their shares shall revert to my wife.
“Item V
“All the balance of my property, both real and personal, of every kind and description, wheresoever situated, which I may own or have the right to dispose of at the time of my decease, I give, bequeath, and devise to my wife, Mae Thomas, in trust, for the benefit and the use of my wife, for and during her life, hereby directing my said trustee, Harry B. Holmes, to pay to her for her use and benefit all the income after the payment of operating expenses and taxes and other charges from my business at The Atlas Linen Laundry and Supply, or any other income that I may have after the payment of the other monthly legacies which I *515 herebefore have set out, with full power granted to my said trustee to lease, transfer, or exchange any securities and property belonging to said trust fund for such prices and upon such terms and conditions as he may deem best, and for the best interests of my wife; to execute and deliver any proxies, powers of attorney, or agreements that the trustee may deem necessary or advisable in administering this trust; and also with full power to compound, compromise, settle and adjust all claims and demands, in favor of or against the trust estate; upon such terms and conditions as he may deem best. Upon the death of my said wife, the said trust as herein created shall cease, and the trustee or his successor shall convey and transfer to my legal heirs the balance of the said property, share and share alike, at the time of the death of mv said wife.
“Item VI
“I make, nominate and appoint my attorney, Harry B. Holmes, of Columbus, Ohio, to be the executor and trustee of this, my last will and testament, with full power and authority to conduct and carry on the laundry business now conducted by me, and to do all things necessary or proper in the usual course of said business until such a time as the same can be sold, as a going business, for a price, which, in the opinion of my said executor, and in the opinion of my said wife, Mae Thomas, is a reasonable value thereof, and with full power and authority to sell and dispose of any or all of my estate, hereby authorizing and empowering my said executor to compound, compromise, settle and adjust all claims and demands in favor of or against my estate, and to sell, at private or public sale, at such prices, and upon such terms of credit or otherwise, as he may deem best, the whole or any part of my real or personal property, and to execute, acknowledge and deliver deeds and other proper instruments of conveyance thereof to the purchaser or purchasers. No *516 purchaser from my said executor need see to the application of the purchase money to or for the purposes of the trust, but the receipt of my executor or trustee shall be a complete discharge and acquittance therefor.
“In witness whereof, I have hereunto set my hand at Columbus, Ohio, this 23rd day of January, 1937.
(Duly witnessed.) Clay M. Thomas.”
‘ ‘ Codicil To My Last Will And Testament.
“I, Clay M. Thomas, of the city of Columbus, county of Franklin, and state of Ohio, do make, publish and declare this codicil to my last will and testament.
“I hereby add the following, to be deemed and taken as if originally inserted in said will. I give, and bequeath to Margaret Cassady, of Columbus, Ohio, the sum of ten thousand ($10,000.00) dollars, payable in monthly installments of one hundred ($100.00) dollars each, and the payment of the same is hereby made a charge upon my business, which is known as The Atlas Linen, Laundry and Supply, and located on Grant avenue, Columbus, Ohio; and that the unpaid balance of the ten thousand ($10,000.00) dollars is to draw interest at five per cent, the same to be included in the one hundred ($100.00) dollar monthly payments until the full sum of ten thousand ($10,000.00) dollars together with interest is fully paid to the said Margaret Cassidy. This bequest is made in consideration of services and money advanced to me for the business by the said Margaret Cassidy, and I hereby instruct my said trustee, Harry B. Holmes, to pay to the said Margaret Cassidy, the sum of one hundred ($100.00) dollars per month until the full settlement of ten thousand ($10,000.00) dollars and interest is fully paid.
“I further authorize and empower my said trustee, Harry B. Holmes, in the exercise of his discretion, to carry on any and all business conducted by me at the time of my decease, or in which I may then be interested, whether alone or in partnership with others, and to continue the same for such time as, in the judgment *517 of the said trustee, shall he for the best interest of my estate, and to extend or renew any such relationships, or to terminate, as the trustee shall think fit, but it is my wish that the said trustee continue my linen and laundry business as long as the same may be profitable.
“I hereby ratify and confirm my said will in all other respects.
“In witness whereof I have hereunto set my hand this 12th day of April, 1938.
(Duly witnessed.) Clay M. Thomas.”
Harry B. Holmes qualified as executor, and the estate was closed as of December 31, 1938. The assets were surrendered as of January 1, 1939, to Harry B. Holmes as trustee under the will. He continued to operate the linen, laundry and supply business. He also continued the construction of houses on the vacant lots and sold many of them. Up to August 31, 1946, as trustee, he paid to the widow as income a total of $263,299.72.
Under date of September 23, 1946, the widow (who had remarried in the fall of 1939 and was then Mae Thomas Hrobon) served demand upon the trustee that he pay over to her the additional sum of $283,726.02 as income. She asserted unauthorized diversion of profits to the payment of legacies and to expense of operation of the business.
Thereupon, on October 3, 1946, this action was instituted by the trustee. The widow and the four other beneficiaries, by answer, joined in the request for construction of the will. Fourteen specific questions were submitted by the trustee and eight by the widow. To some extent the questions are duplicated. All the questions, except three which were withdrawn, were answered by both the Probate Court and the Court of Appeals. Those answers form the basis of appeal to this court and necessitate review. Construction of the will governs the answers.
*518 All parties acknowledge that the cardinal rale to follow in a will construction case is to ascertain the intention of the testator. If possible the testator’s intention must be determined from the instrument itself. It is, however, well settled that where there is some doubt as to the meaning of the will the court may admit extrinsic evidence of the testator’s family situation, his business and financial circumstances, the nature and extent of his investments, the character and manner of operation of his business and the natural objects of his bounty. With such evidence the court is better able to see things as the testator saw them and to construe the words used in the will as he understood them and to give that construction which he intended. These rules do not make admissible conversation between the testator and the scrivener at the time the will was drawn or with respect to its meaning. The words used in the will are to be taken in their primary or ordinary sense, unless it is manifest from the context of the whole will or from the subject matter that the testator intendéd to use them in a different sense. It is always to be remembered that rales of construction are useful or applicable only so far as they aid in determining the intention expressed by the testator. Worman v. Teagarden, Jr., 2 Ohio St., 380; Sommers v. Doersam, 115 Ohio St., 139, 152 N. E., 387; 69 Corpus Juris, 73, Section 1128C; Page on Wills (Lifetime Ed.), 786 et seq., Section 913 et seq.; Thompson, Wills (3 Ed.), 320 et seq., Section 210 et seq.; 57 American Jurisprudence, 726, Section 1133 et seq.
The evidence admitted by the master commissioner was competent under the rules above outlined and we find no error with respect to its admission.
The following basic conclusions we deem clearly warranted — in fact, necessitated.
Clay M. Thomas was a successful business man who knew well the extent of his estate and the problems of operating his business.
*519 He knew Ms obligations.
His wife, Mae Thomas, was the principal object of his bounty.
He had great confidence in Harry B. Holmes, his attorney, and associate in at least a portion of his business.
He desired his business known as Atlas Linen Laundry & Supply to be operated by the trustee so long as it could be operated profitably, such operation to be for the benefit of his wife.
To accomplish these results broad powers were granted the trustee in the will which was executed on January 23, 1937, and still broader powers were given the trustee in the codicil of April 12, 1938, which was executed a few days before the testator’s death.
Having in mind these basic conclusions, we further conclude and hold as follows:
There has been much discussion and we fear considerable confused thinking with respect to the provision in item V of the will which reads:
“* * * hereby directing my said trustee, Harry B. Holmes, to pay to her for her use and benefit all the income after the payment of operating expenses and taxes and other charges from my business at the Atlas Linen Laundry and Supply, or any other income that I may have after the payment of the other monthly legacies which I heretofore have set out * *
Obviously, this provision is not a model of good English. It is necessary to study it and to have in mind the other provisions of the will indicating the general overall intent of the testator. One patently ambiguous word is the word, “from.” Operating expenses, taxes and other charges are not ordinarily thought of as rising from a business. Income, however, does arise from the business. In order to arrive at the true intent of the testator, it seems, therefore, necessary to consider the words, “from my business at the Atlas Linen Laundry and Supply,” as related *520 to the word, “income.” Then, the word, “or,” seems an unhappy choice of words. It would appear not to have been the intent of the testator to give the trustee the option of paying to the widow either the income from Atlas or any other income received. The word, “or,” must have been used in the sense of “and.”
Considering these ambiguities and arriving at a construction consistent with the overall intent of the testator, we construe the above-quoted portion of item V as though written:
“Hereby directing my said trustee, Harry B. Holmes, to pay to her for her use and benefit all the income from my business at the Atlas Linen Laundry & Supply and any other income that I may have, after the payment of operating expenses, taxes and other charges and the payment of the other monthly legacies which I have heretofore set out.”
Only one trust estate was created and it consists of all the net assets of the testator, including the real estate owned by him as well as the assets used in the operation of Atlas Linen Laundry & Supply.
Contrary to the judgment of the Court of Appeals, we consider payment of the bequests to Clara J. Thomas Mann, Millie K. Thomas Watson and Ray G. Thomas as a charge upon the entire income of the trust rather than primarily a charge upon income derived from operations other than the business of Atlas Linen Laundry & Supply. The bequest to Margaret Cassidy is a charge upon the income derived from the operation of Atlas.
Giving full consideration to the desire of the testator that the Atlas business be continued, the history of its past operation, the fact that it had always been operated and expanded out of earnings, the complete lack of capital with which the trustee could operate, the amount of the profits realized from the business *521 during the latter years of operation by the testator and the impossibility of operation by the trustee without using a portion of the income as capital, we conclude that it was the intention of the testator to and he did authorize the use by the trustee of income in the operation and expansion of Atlas, even though such use reduced the amount of profits currently available for payment to the widow. The right of the trustee to so use income would exist only so long as the business was operated profitably and the widow received a reasonable amount of the income. That the widow has not suffered hardship is evidenced by payment to her of $263,299.72 up to August 31, 1946. Although the record does not contain evidence of the amounts paid to the widow since 1946, photostatic copies of checks in her favor included in the briefs indicate payment of $100,000 to her during the first ten months of 1952.
The right of the trustee to use income in operation extends to all phases of operation which sound business judgment would approve, but such right of the trustee to use a portion of the income does not authorize accounting such as will result in currently increasing the corpus of the trust estate or confiscation of income payable to the life tenant.
This court does not undertake to direct the detailed manner in which the trustee’s accounts should be kept. It is hoped, however, that such general principles may be herein stated as will enable accountants to rewrite or amend the trustee’s books of account so that they will satisfy all legal requirements. This is an operating or productive trust and not a static trust. The assets of the trust are used in a going business and the income of that business goes to the beneficiary named, to wit, the widow and not to the remaindermen. “Income” as used in the will is not income in the sense *522 of a rate of return upon money invested but is the profit derived from operating the business. That operation may produce a very large or very little income. All that it does produce belongs solely to the widow and is either payable to her currently or it must be so set up in the accounting records as to preserve her ultimate right to it. To accomplish these ends a method of accounting may be adopted somewhat different from the usual business accounting but required because it fits these peculiar circumstances.
The first item of capital is the value of the corpus of the trust. The “corpus” of the trust as here used is that portion of the total assets of the estate remaining after deduction of all debts of the testator as they existed at the time of his death, all taxes, the widow’s year’s allowance, the amount exempt from administration and the entire cost of the administration. Upon determination of that amount it should be shown in the books of account and it will represent the amount as to which the remaindermen were entitled- to the protection of law at the inception of the trust. The corpus of the trust is an amount of money representing the net assets of the estate as above stated. It does not consist of specific property. When so set up on the books of account, the amount of money representing the corpus of the trust will not be reduced as a result of the operation of the business. On the other hand, the use of income by the trustee in the operation, maintenance or expansion of the business must not be permitted to result in currently increasing the value of the corpus of the trust.
Expenditures by the trustee out of income may, and in all probability will, result in increasing the total net assets used in operation of the business. This may be considered as increasing the capital. Since, as we have stated, such increase does not currently change *523 the value of the corpus of the trust, that increase in the capital belongs to the widow and she is entitled to receive it upon sale of the business or termination of the trust. The books of account must be so kept that annual statements will reflect the total net assets of the trust and reflect both, the unchanging value of the corpus and the additional capital resulting from expenditure of income. It would seem obvious that at a given time the latter element of capital, to wit, the amount thereof resulting from investment of income, will be the difference between the total net assets and the original and unchanged value of the corpus.
The court is mindful of the fact that upon sale of the business or termination of the trust there may be an item of intangible value, goodwill or going value, not represented by physical assets or cash in the hands of the trustee, the disposition of which may call for the court’s determination at that time. No such issue is now before this court and this decision is not to be considered as dispositive of any such questions or issues except to the limited extent herein stated.
At this point some further comment is required with respect to the determination of the value of the net assets of the estate — which became the corpus of the trust.
The inventory and appraisal made at the time the trustee took possession has not been challenged except that some changes and adjustments were made by the Commissioner of Internal Revenue in connection with the federal estate tax return. Those changes appear warranted and were accepted by the estate. The most important item so changed was the value placed upon the lots utilized in the building operations. The record indicates that the values assigned to those lots were increased by the commissioner to the basis of their *524 actual cost, thus effecting an increase of $61,410. Since, as we hold, the bequests to Clara J. Thomas Mann, Millie K. Thomas Watson, Bay G. Thomas and Margaret Cassidy, totaling $55,000, are not specific bequests but are payable out of income, those amounts should not be deducted from the total assets of the estate in determining the amount of the corpus of the trust. The appraisal of the estate should be corrected to reflect the increase in value determined by the Commissioner of Internal Bevenue. The corpus of the trust should be increased by including therein the amounts of the four bequests above named, which were erroneously considered as specific bequests. The resulting corpus of the trust will be larger than now indicated by the books of account of the trustee. We do not undertake to determine the exact amount of the corpus, but its determination by an accountant should not be difficult.
The words, “other charges,” which appear in item Y of the will have been given much consideration by the lower courts and have been discussed in briefs at great length. Is their meaning to be limited to items similar to operating expenses and taxes under the rule of ejusclem generis or should they be given a broader interpretation in harmony with the broad powers given to the trustee? We adopt the latter interpretation.
Beferring to specific transactions affected by that interpretation, we hold that the trustee had the right and authority to use income as needed with which to purchase five competing businesses. We do not, however, approve the accounting now in the records of the trustee with respect to those purchases. In each instance some physical equipment was acquired (except as to the Martha Sanders business) and also a quantity of linen (commonly called “float”) in the *525 hands of customers. A large part of the cost of all five businesses represented the value of the goodwill —the intangible value. The trustee included the items of equipment in appropriate accounts but charged the entire balance covering “float” (linen in service) and intangibles to operating expense in the years of the respective purchases. Such accounting does not protect the interests of the life tenant. .The valuation placed upon the items of equipment included in the purchases is not challenged and, therefore, is approved. Two witnesses, Landgrave, the trustee’s bookkeeper, and Hopkins, a certified public accountant, testified as to the value of the linen in use — the ‘ ‘ float. ’ ’ By slightly different formulae they reached substantially the same conclusion. No other evidence was introduced on that subject and we adopt and approve the computation of witness Hopkins as to the value of the linen in service. We also adopt the conclusion of witness Hopkins that the amount of the purchase price remaining after deduction of cost of equipment and value of linen in service — in other words, the amount representing intangible value — should be included in the capital assets but should be amortized and written out of the capital account over a period of years. He recommended a five-year period of amortization with respect to the cost of the goodwill of the three smaller businesses (Eosen, Winter and Sanders) and ten years with respect to Bowden and the 5c Towel businesses. We see no reason for the distinction and hold that a ten-year period of amortization should be used as to all five businesses. Income of the widow would thus be used to purchase those items of goodwill but, the investment having been made in the exercise of sound business judgment, it is to be assumed that the income of the widow during the succeeding years would be increased by reason of such *526 expenditure of income. It is, therefore, proper to write out of the capital account one-tenth of this goodwill value during each of the succeeding ten years. A tabulation of the amount so expended for the five businesses, the portion of those' amounts allocated to goodwill and the schedule of amortization follows:

Date Total Cost Equipment “Float" “Good- Amortiwill” zation

Rosen 1-16-40 750. 125. 440.00 185.00 18.50
Winter 7- 3-40 2,250. 375. 845.00 1,030.00 103.00
Sanders 1-12-42 905. 540.32 365.36 36.54
5c Towel 5-19-45 50.000. 2.250. 17.573.44 30.176.56 3.017.65
Bowden 5-19-45 50.000. 2.250. 17.573.44 30.176.56 3.017.66
Upon sale of the business or ‘termination of the trust, the unamortized portions'of the cost of goodwill of the five businesses purchased would still be present in the statement of capital assets and the widow would be entitled to receive such unamortized amounts, provided, however, that such payment to her may not effect any reduction in the stated value of the ‘ ‘ corpus. ’ ’
Since the life of linen in service is shown to be less than one year, the trustee’s practice of charging the linen to expense when put into service is approved. For like reasons we approve charging the value of “float,” purchased with the five businesses, to expense in the year of purchase.
The next item of “other charges” to be considered is the cost of a $75,000 insurance policy on the life of the trustee. We do not consider this expenditure authorized under Section 10506-41, General Code, which controls investments by fiduciaries. We, however, approve the expenditure as an item of operating expense. Harry B. Holmes was peculiarly valuable in the operation of the business. It is common *527 practice to insure the lives of key men in a business organization, and to charge the cost of such insurance as an expense of doing business. We were informed during argument that, since the hearing before the referee, the trustee has cancelled the policy and has accounted for its cash value. That amount so received as the cash value should be distributed to the years during which premiums were paid, thus reducing the charges made to operation.
As indicating careful and orderly operation by the trustee, it should be said with respect to the purchase of the 5c Towel Supply-Company, Bowden Towel Supply Company and the insurance policy, that the trustee procured the approval of the Probate Court in advance of the purchases. Although not the basis for our decision there was also substantial evidence of approval by the life tenant of the purchase of the two businesses just named, which would effect estoppel as to, or ratification by, her.
Complaint is made with respect to the purchase of additional land across the street from the Grant avenue plant to be used for expansion and to the expenditure of some $3,000 for architect’s services. We consider the powers of the trustee sufficiently broad to authorize all expenditures necessary in the exercise of sound business judgment to operate, maintain and expand the business of Atlas Linen Laundry & Supply. The purchase of the additional land on Grant avenue to meet the increasing demands of the business was justified and is approved, but the cost, having been ■paid from income, should be so set up in the accounts as to insure the life tenant return of the money. So long as the land is vacant no yearly amount for depreciation can be charged. The services of the architect were employed in connection with a proposed building which was never erected. Under such eir *528 cumstances we deem the expenditure for architect’s services properly chargeable as an operating expense.
Taxes chargeable to income have been properly defined as all taxes of every kind and nature imposed by public authority.
The action of the trustee in effecting settlement with Louis A. Yoisinet, in the making of changes inside the factory, and in the replacement and addition of boilers and other items of equipment is approved but with direction to effect such accounting as will preserve but not increase the corpus.
The trustee’s question number 7 is:
“Is the surviving spouse to be paid any income from business transacted by the executor during the administration of the estate, prior to the setting up of the trust estate, in addition to the amount allowed her for a year’s support.”
As to this question, we agree with the answer given by the Court of Appeals. In the case of Davidson v. Miners & Mechanics Savings & Trust Co., Exr., 129 Ohio St., 418, 195 N. E., 845, 98 A. L. R., 1318, this court held that, where one is bequeathed the income from certain property for life, he is entitled to such income from the time of the death of the testator, in the absence of anything in the will to the contrary. In that case the widow, who received an allowance for her year’s support, was not the one to whom the life income was bequeathed, but the principle there stated is applicable in the instant action. Here the widow was allowed $10,000 for her year’s support under the statutes, not by virtue of the will. That amount was payable to her out of the corpus of the estate before the corpus of the trust was determined. There is nothing in the will indicating that the widow should be denied the income derived from the business while operated by the executor. That income should not *529 be added to the trust corpus. The accounts should be so adjusted that the life tenant will receive that income.
Trustee’s questions numbers 9, 10 and 11 relate to payment of debts of the testator and payment of interest on his obligations. Among other obligations, mortgages executed in connection with testator’s real estate operations are involved. The problem is simplified by this court’s holding that but one trust corpus exists. The real estate was part of the total assets of the estate and to the extent that its value was preserved when the estate was settled it became part of the corpus of the trust. Continued operation by the trustee of the real estate venture was authorized by the following provision of the codicil:
“I further authorize and empower my said trustee, Harry B. Holmes, in the exercise of his discretion, to carry on any and all business conducted by me at the time of my decease, or in which I may then be interested.”
The trustee did continue the real estate business just as it had been conducted by the testator. The trustee built houses in order to dispose of the lots. He finally succeeded in disposing of the lots and houses at a profit. The real estate operations were as much a part of the trust activity as the operation of Atlas. The profits realized from the real estate operations were a part of the total profits realized through operation of the trust and were to be accounted for in the same manner. Any interest obligations incurred by the trustee in those operations were chargeable to operating expense. Likewise, taxes on the real estate and taxes on personal property, which accrued after the testator’s death, were chargeable as operating expense.
Interest which accrued on obligations of the testator *530 up to the time of his death was a debt and payable out of the estate. Interest which accrued on such debts after the testator’s death, including interest on notes secured by mortgage on the Atlas plant, was chargeable as operating expense.
The answers to life tenant’s questions numbers 1, 2, 3, 4, 5 and 7 are found in the foregoing discussion. The answer to life tenant’s question number 6 is: “Yes, the trustee was authorized to convert the real estate, other than that used in the laundry business, into cash and spend this cash in the enlargement and addition of the original laundry business, if such expenditures conformed to sound business judgment, the life tenant received currently a reasonable income, the amount of the trust corpus was maintained, and the accounting preserves a record of expenditures of income so as to provide for ultimate distribution to the life tenant consistent with her rights as herein set forth. ’ ’
Who should be required to pay the costs and expenses of this litigation? The major items are taxable court costs and fees for services of the trustee’s attorneys, services of the life tenant’s attorneys, services of the remaindermen’s attorneys, services of the master commissioner and of the referee, services of reporters, and services of accountants. The Court of Appeals stated .that the life tenant employed her own attorneys and that their compensation is not involved. We accept that statement and, therefore, exclude their compensation from this discussion. We agree with the conclusion of the Court of Appeals that it was necessary that this proceeding be instituted in order to determine numerous questions which had arisen respecting the powers of the trustee, the rights of the life tenant and the protection of the remainder-men and, therefore, that the costs and expenses should *531 be divided. We do not, however, believe that any portion should be charged to the remaindermen individually. Under the terms of the will any one or all of the named remaindermen who may predecease the life tenant will receive no benefits from the will. Participation in this litigation by the named remainder-men was for the purpose of protecting the corpus of the trust. We hold that the entire costs and expense of this litigation, excepting the services of the life tenant’s attorneys, should be paid equally out of the corpus and the income of the trust. This charge to corpus will, by the amount so charged, reduce the corpus which will eventually pass to the remaindermen. The accounting records relating to corpus and to income payable to the life tenant should be adjusted accordingly.
This court does not undertake to restate the books of account of the trustee or to determine the status of the income account of the life tenant. In the record of the protracted hearings and the voluminous briefs of counsel many details of operation of the business are recorded and debated which need not be discussed in this opinion. The principles herein announced should enable accountants to adjust or rewrite the books of account.
The judgment of the Court of Appeals is affirmed in part and reversed in part, and the cause is remanded to the Probate Court of Franklin County for accounting and further proceedings consistent herewith.

Judgment accordingly.

Weygandt, C. J., Taft, Matthias, Hart and Stewart, JJ., concur.